FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 30 2023

TAMMY H. DOWNS, CLERK
By:_____
                    DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

WILLIAM "BILL" HUSTON                           PLAINTIFF

vs.                      CASE NO. 4:23-CV-615-BSM

TRI-IMAGING SOLUTIONS                       DEFENDANT

## COMPLAINT

COMES NOW the Plaintiff, William "Bill" Huston, by and through his attorneys, Sydney L. Rasch and Jonathan Martin, of Turner, Rasch, & Martin LLP, and for his Complaint against Tri-Imaging Solutions, does hereby state and allege as follows:

### I. NATURE OF THE ACTION

1. This is an action for breach of employment contract under Arkansas common law and wrongful termination under the Family Medical Leave Act 29 U.S.C. §2601 et. seq. ("FMLA").

2. Plaintiff was employed by Defendant from November 7, 2007, until October 6, 2022.

3. Plaintiff alleges Defendant breached his employment contract.

4. Plaintiff alleges that Defendant unlawfully discharged Plaintiff on October 6, 2022, for taking statutorily protected leave in violation of the FMLA.

### II. PARTIES, JURISDICTION, AND VENUE

4. Plaintiff Bill Huston is a resident of Faulkner County, Arkansas.

5. Defendant Tri-Imaging Solution (formerly "Frontier Imaging Services LLC") is a Domestic Corporation registered to do business in the State of Tennessee.

This case assigned to District Judge _Miller_
and to Magistrate Judge _Ervin_

6. The United States District Court for the Eastern District of Arkansas, Central Division, has diversity jurisdiction over this suit under the provisions of 28 U.S.C. § 1332, as the parties are residents of different states and Mr. Huston's damages exceed $75,000.

7. The United States District Court for the Eastern District of Arkansas, Eastern Division, has subject matter jurisdiction over this suit under the provisions of 28 U.S.C. § 1331.

8. The acts complained of herein were committed and had their principal effect against Plaintiff within the Eastern District of Arkansas, Eastern Division; therefore, venue is proper within this District pursuant to 28 U.S.C. § 1391.

9. This Court has supplemental jurisdiction over Plaintiff's Arkansas statutory and common law claims pursuant to 28 U.S.C. § 1367(a).

### III. FACTUAL ALLEGATIONS

1. At all relevant times herein, Defendant has been a Corporation maintaining a place of business in Tennessee.

2. Defendant is primarily engaged in providing medical equipment service providers with replacement parts, service support, technical training, and pre-owned medical equipment.

3. At all times relevant herein, Mr. Huston was an "eligible employee" as defined by the FMLA.

4. At all relevant times herein, Defendant was the "employer" of Mr. Huston within the meaning of the FMLA.

5. Mr. Huston was injured by the acts and omissions of Defendant during such time as he was entitled to the rights and protections of the FMLA.

6. Defendant was both engaged in commerce or in an industry or activity affecting commerce and employed more than 50 employees for each working day during each of twenty or more calendar weeks in each calendar year (2022) relevant hereto.

7. Mr. Huston began working with the Defendant in March of 2019. Mr. Huston's most recent position was as a Senior Imaging Engineer in Dallas, Texas.

8. Mr. Huston was a hardworking and successful employee throughout his time at Tri-Imaging.

## EMPLOYMENT CONTRACT

9. In October of 2021, Mr. Huston received an offer of employment from another employer in the industry.

10. In order to induce Mr. Huston to stay with the company, Defendant promised Mr. Huston a transfer to Arkansas so that he could be closer to his family.

11. On October 20, 2021, Defendant made an official promise to relocate Mr. Huston to Arkansas as a "Central Zone Service Manager" as soon as a position became available. Additionally, Defendant agreed to provide a relocation bonus of $20,000 to assist with moving expenses. *Please see Exhibit A attached hereto.*

12. In January of 2022, Mr. Huston informed his supervisor, Miriam Rohe, that he intended to construct a new home in Conway, Arkansas, in reliance on the job relocation. Mr. Huston requested confirmation that his position would be ready.

13. Ms. Rohe assured Mr. Huston that he could begin construction on his new home in Arkansas as he would have a job waiting for him there. Ms. Rohe will attest to this conversation in a sworn affidavit.

14. In reliance on the promise of employment in Arkansas, Mr. Huston made numerous irretrievable contractual and financial commitments:

   a. On January 7, 2022, Mr. Huston and his wife, Linda Huston, signed a contract with Drew Hester Construction, Inc. for the construction of a new home in Conway, Arkansas. The contract price was approximately $552,388.00. *Please see Exhibit B attached hereto.*

   b. On January 7, 2022, Mr. Huston and his wife signed an "Agreement to Hold Lot" at the site for their new home with Drew Hester Construction Company, including a non-refundable deposit of $5,000. *Please see Exhibit C attached hereto.*

   c. On February 14, 2022, Mr. Huston made a non-refundable down payment of $30,000 to Drew Hester Construction, Inc. *Please see Exhibit D attached hereto.*

   d. In April of 2022, Mr. Huston moved to Arkansas in anticipation of the new job.

   e. On May 5, 2022, Mr. Huston paid Green Van Lines $3,000 for moving services. *Please see Exhibit E attached hereto.*

15. Aside from the $6,000 temporary contract job, Mr. Huston has received no compensation or employment since October 6, 2022.

16. Mr. Huston has suffered significant financial harm as a result of the sudden termination of his employment contract with Defendant and the financial commitments he undertook in contemplation of Defendant's promise of employment.

## MEDICAL LEAVE

17. In August of 2022, Mr. Huston requested to use his PTO to undergo knee surgery requiring multiple weeks of recovery, which Defendant approved.

18. At no time did Defendant inform Mr. Huston that he might be eligible for FMLA protected leave pursuant to his request to undergo surgery.

19. At no time did Defendant or any representative of Defendant issue Mr. Huston a notice of his rights under the FMLA.

20. Mr. Huston was absent from work for surgery beginning on September 19, 2022.

21. On October 3, 2022, Mr. Huston called his new supervisor, James Kuykendall, to update him about the status of his recovery from surgery.

22. During the phone call, Mr. Kuykendall informed Mr. Huston that his employment with Defendant was terminated.

23. At no point did any representative of Defendant accuse Mr. Huston of breaching his employment contract or engaging in misconduct of any kind. The sole explanation Mr. Huston was given for the unexpected termination of his employment contract was that his services were "no longer needed".

24. Following his termination, Mr. Huston was unable to find work between October 3, 2022, and February 2023.

25. Between October 2022 and February 2023, the only employment Mr. Huston was able to secure was a temporary, 6-week contractor job in which he earned $6,000.

26. Aside from the $6,000 temporary contract job, Mr. Huston has received no compensation or employment since October 6, 2022.

27. Mr. Huston has suffered significant financial harm as a result of the sudden termination of his employment contract with Defendant and the financial commitments he undertook in contemplation of Defendant's promise of employment.

## IV.    COUNT ONE: BREACH OF CONTRACT

28.    Plaintiff repeats and re-alleges all previous paragraphs of this Complaint as though fully incorporated in this section.

29.    Plaintiff and Defendant had an agreement that Defendant would hold open a "Central Zone Service Manager" position in Conway, Arkansas. This agreement was memorialized in written offer by Defendant's agent, which Plaintiff accepted. *Please see Exhibit A attached hereto.*

30.    Defendant breached that agreement by terminating Mr. Huston's employment contract without cause.

31.    As a result of Defendant's breach, Mr. Huston lost income for over 4 months.

32.    As a consequence of Defendant's breach, Mr. Huston suffered substantial financial harm in relocation expenses, and other damages.

33.    The consequential harm of relocation costs was within the contemplation of the parties at the time the employment agreement was entered into, as the parties specifically discussed the expenses of moving to Arkansas and Defendant agreed to assist by means of a relocation bonus. *Please see Exhibit A attached hereto.*

34.    Plaintiff is entitled to, and he seeks, the sum of his lost wages and other compensation denied or lost to him by reason of Defendant's breach of contract, consequential damages incurred in his efforts to relocate to Arkansas, plus any interest he is entitled to for this cause.

## V. COUNT TWO: PROMISSORY ESTOPPEL

35.    Plaintiff repeats and re-alleges all previous paragraphs of this Complaint as though fully incorporated in this section.

36. Defendant made a significant promise in assuring Mr. Huston that he would have a position as "Central Zone Service Manager" in Arkansas in order to induce him to relocate to Arkansas.

37. Mr. Huston reasonably relied on Defendant's promise of employment in declining other employment opportunities.

38. Mr. Huston reasonably relied on Defendant's promise of employment in taking substantial steps towards relocating to Arkansas.

39. Plaintiff has suffered irreparable injury and monetary damages as a result of relying on Defendant's promise.

40. Justice can only be done by Defendant compensating Mr. Huston for the expenses he incurred in reliance on Defendant's promise of employment.

41. Plaintiff is entitled to and he seeks, the sum of his lost wages and other compensation denied or lost to him by reason of Defendant's breach of contract, consequential damages incurred in his efforts to relocate to Arkansas, plus any interest he is entitled to for this cause.

### VI.   COUNT THREE: FMLA

42. Plaintiff repeats and re-alleges all previous paragraphs of this Complaint as though fully incorporated in this section.

43. The FMLA protects an eligible employee's right to be reinstated to the same or equivalent position after taking protected leave. 29 U.S.C. §2601 et. seq.

44. An employee is eligible for FMLA leave when he has worked for the employer for at least twelve (12) months and is unable to work due to a serious health condition.

45. The FMLA prohibits an employer from restraining, interfering with, or denying an employee's exercise of protected leave.

46. The FMLA prohibits an employer from discharging an employee for exercising a statutory right.

47. In order to invoke the protections of the FMLA, an employee need only advise his employer in a timely manner that he will be absent under circumstances which indicate that FMLA may apply. The employee is not statutorily required to reference the FMLA specifically; it is the employer's responsibility to recognize that the absence may qualify for FMLA protection. 29 U.S.C. §2612(e).

48. In August of 2022, Plaintiff timely notified Defendant that he would be absent for an extended period to undergo knee surgery. In so doing, Plaintiff fulfilled his statutory responsibility to notify his employer of absences that qualified FMLA protection.

49. Plaintiff was eligible for the protections of the FMLA for his absences for knee surgery beginning in September of 2022, as he was employed by Defendant for over twelve (12) months at the time he requested leave and was unable to work due to a serious health condition. 29 U.S.C. §2601 et. seq.

50. Defendant unlawfully discharged Plaintiff in retaliation for his exercise of FMLA protected leave for his knee surgery.

51. Defendant failed to reinstate Plaintiff to the same or equivalent position after Plaintiff exercised statutorily protected leave.

52. By reason of Defendant's failure to reinstate Plaintiff and Defendant's retaliation against Plaintiff's exercise of his rights, Plaintiff is entitled to all legal and equitable remedies available for violations of FMLA, including lost wages, benefits and other compensation,

liquidated damages for willful violations, attorneys' fees and costs, and other compensation pursuant to 29 U.S.C. §2617 et. seq.

## VII.   JURY DEMAND

53.   Plaintiff requests a trial by jury.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff Bill Huston requests that Defendant be summoned to appear and answer herein; for the entry of a declaratory judgment in favor of Plaintiff decreeing that his state and federally protected rights have been violated; that this Court enter monetary judgment in his favor and against Defendant in excess of $75,000.00, plus interest, liquidated damages as that term is defined in the applicable state and federal laws, compensatory damages, consequential damages, punitive damages, reasonable attorneys' fees, costs of action and other relief as this Court deems appropriate.

Respectfully submitted,

PLAINTIFF BILL HUSTON

Sydney L. Rasch, Esq.
AR Bar No. 2019138
Turner, Rasch & Martin LLP
300 S. Spring St., Ste. 420
Little Rock, AR 72201
(501) 835-6792
sydney@trm-llp.com

Jonathan P. Martin, Esq.
AR Bar No. 2014041
Turner, Rasch & Martin LLP
300 S. Spring St., Ste. 420
Little Rock, AR 72201
(501) 835-6792
jonathan@trm-llp.com

 

October 20, 2021

Bill Huston
340 Kingsbury Lane
Prosper, TX 75078

Dear Bill,

It is Frontier Imaging Services intentions to change your existing employment with FIS at a future date, pursuant to the discussions that we have had. The general terms and conditions of the intended position are listed below:

> Position: Central Zone Service Manager
>
> Location: Arkansas
>
> Manager: Miriam Rohe
>
> Salary Structure: $156,000.00 annually ($6,000.00 paid bi-weekly). Your position is salaried exempt.
>
> Scope: Current position as Senior Imaging Engineer will be maintained until the University of Texas Southwest Medical Center contract has been completed or until an agreed upon time thereafter. While completing this contract assignment you agree to help train your replacement. Once the contract replacement has been fully trained, we intend to provide you with a relocation bonus detailed below Once moved, your role and title will be transitioned to Central Zone Service Manager, and you will assume the duties assigned to that role.
>
>> *Pack and Ship Move:* Relocation bonus up to $20,000.00 will be paid within one month of intended move from Dallas, TX to Arkansas. IRS tax regulations classifies relocation costs that are paid by the Company or reimbursed to the employee as taxable W-2 income and will be reported as such. If employee leaves the Company for any reason other than death, disability, or discharge without cause within twelve (12) months of the completion of this move, the employee will reimburse Frontier Imaging Services all relocation costs and temporary living expenses paid directly by the Company or reimbursed to the employee. Repayment can be made in installments.

Sincerely,


John Drew

1502 Professional Drive, Imperial, MO 63052
Francis.vonderhaar@frontierimagingservices.com





# Drew Hester Construction, Inc.
drewhesterconstruction@gmail.com • 501.499.4415

## SINGLE-FAMILY HOME BUILDING CONTRACT ON CONTRACTOR'S LOT

This Agreement is made this **7th** day of **January**, 20**22** by and between **William K. and Linda A. Huston, 340 Kingsbury LN, Prosper, TX 75078**, herein called "the owner", and **Drew Hester Construction, Inc., 3250 Southern Oaks Road, Conway, AR 72032**, herein called "the Contractor", for a project at **1730 Winterbrook Drive, Conway, AR 72034**, herein called "the Home". The Contractor and the Owner agree as follows:

### ARTICLE I
### CONTRACT DOCUMENTS

**1.1 Contract Documents**. The contract documents consist of this agreement, Plans (Attachment I), Contractor Specifications (Attachment II), and Change Orders issued after the execution of this Agreement; these form the Contract and are incorporated herein by reference. The terms of this Agreement shall prevail over any conflicting provisions in the documents incorporated by reference. If a conflict exists between the Plans and the Contractor Specifications, the Contractor Specifications shall govern.

**1.2 Change Orders**. Without invalidating this contract, the Owner may request changes in the work and at the contractor's discretion the contractor may perform the work. Changes or overages to the home should be in writing and agreed upon by the owner and the contractor. Overages, if any, will be due at the time of authorization of the change. In the event that the owner makes changes without knowledge or agreement of the cost of the change or without the Contractor's knowledge of the change or the amount of the change, the owner will be responsible for the change.

If the change reduces the cost, the Owner will receive a credit, but the Contractor's supervision and overhead expenses and profit will not be reduced. Any additional cost shall be paid for prior to installation, and the construction loan account may not be used to pay for changes. The Owner agrees to make requests concerning any changes, additions, or alterations in the work to the Contractor, and the Owner agrees not to issue any instructions to or otherwise negotiate for additional work with, the Contractor's subcontractors or employees. Any Owner may sign the change order on his or her behalf and on behalf of the other, and the signature shall be binding on all Owners.

### ARTICLE II
### SCOPE OF THE WORK

**2.1 Services**. The Contractor agrees to provide the necessary services including materials, labor, equipment, project management and supervision to complete the project as follows: **Build new home**

**PLAINTIFF'S EXHIBIT B**

Owner Initials _____ _____                                                                                     Page 1 of 5

**per the Plans and Contractor Specifications on Contractor's lot at 1730 Winterbrook Drive, Conway, AR 72034** (the "Services").

**2.2 Plans and Specifications.** The Contractor shall complete all the Services pursuant to the Plans provided by the Owner, attached hereto as Attachment I, and Contractor Specifications, agreed upon by both parties and attached hereto as Attachment II. If a conflict exists between the Plans and the Contractor Specifications, or the Plans do not specify, the Contractor Specifications govern.

**2.3 Errors.** Contractor shall not commence provision of the Services or continue with the provision of the Services where Contractor discovers any discrepancies, errors or omissions in the Plans or where anything materially changes or effects the Plans. Contractor agrees to inform the Owner of any such findings and shall only commence or recommence any work after obtaining the written consent of the Owner.

**2.4 Methods.** The Contractor's methods of meeting the obligations pursuant to this Agreement shall be determined by the Contractor in its sole discretion and judgment, subject to the provisions and requirements of this Agreement, reasonable consultation with the Owner and subject to the understanding that the Contractor will provide the Services in the best interests of the Owner.

**2.5 Owner's Work.** Owner agrees not to perform any work at the Home until after the Contractor's completion and final payment.

## ARTICLE III
## CONTRACT PRICE AND PAYMENTS

**3.1 Contract Price.** The Owner agrees to pay the total Contract Price of **approximately $552,388.00** to the Contractor. Of the total Contract Price, **$73,000.00** is for the purchase of the lot located at **1730 Winterbrook Drive, Conway, AR 72034 with a legal description of Lot 95, Winterbrook Sub Ph 3** and the remaining amount of **approximately $479,388.00** is for all labor and materials furnished and work performed by the Contractor, subject to additions and deletions by Change Order. It is understood by both parties that this amount is an original, best estimate based on the Plans provided by the Owner, Contractor Specifications agreed to by both parties and the labor and material costs at the time the estimate was calculated.

**3.2 Allowances**. The allowances include materials delivery, installation, and sales tax unless expressly noted otherwise. The parties agree that the allowances are not to be construed as bids by the Contractor and that the allowances may vary from the actual cost based on the Owner's selections. If the cost of the Owner-selected materials exceeds the material allowance, the amount of the excess will be due upon selection. If the amount is less than the allowance amount, the amount will be subtracted from the final payment. See Contractor Specifications (Attachment II).

**3.3 Payments.** A non-refundable deposit in the amount of **$30,000** has been deposited with the Contractor. A portion of the non-refundable deposit, in the amount of **$15,000**, is to compensate the Contractor for interest expense, loan carrying costs and real estate taxes incurred by the Contractor during the completion of the Services. Any remaining amount of this portion of the non-refundable deposit that is not needed to fully compensate the Contractor for interest expense, loan carrying costs and real estate taxes incurred by the Contractor during the completion of the Services will be applied to

the total Contract Price due at the completion of the Services. The remaining portion of the non-refundable deposit, in the amount of **$15,000**, will be applied to the total Contract Price due at the completion of the Services.

An amount of **$5,000** has previously been deposited with the Contractor by the Owner as a hold on the lot and will be deducted from the total Contract Price due at the completion of the Services.

Any additional payments to be made as a result of change orders or budget overages made or incurred during completion of the Services, will be the responsibility of the Owner at the time of the change order and/or overage and will **NOT BE** included in the final purchase price amount. Any additional payments due to change orders are due before the work is done. Any additional payments due as a result of budget/allowance overages are due at the time they are incurred.

The remaining **$532,388.00** of the total Contract Price is due upon completion of the Services, to be paid in full by the Owner through means of cash, conventional loan, or other method approved by the Contractor. The entire amount of the total Contract Price to be paid in full within 30 days after completion. Owner agrees not to occupy the Home until the contractor is paid in full.

If the Owner is unable to fulfill payment of the Contract Price of this Contract, all deposits held by the Contractor will be retained permanently by the Contractor, in full, regardless of the stage of the completion of the Home at the time of the breach of contract. In the event of a breach of contract by the Owner, the Home will remain under ownership of the Contractor who may retain or market the Home for sale based solely on the Contractor's discretion.

## ARTICLE IV
## TIME AND COMPLETION

**4.1 Commencement**. The Contractor will commence work after execution of this agreement, after owner satisfies documentation of loan commitment and deposit as required by contractor, when applicable.

**4.2 Substantial Completion**. Substantial completion occurs when a certificate of occupancy is issued by the local building official, where applicable, or when home is ready for vacancy.

**4.3 Punch List**. Owners are to give a punch list to Contractor within **5 business days** after substantial completion, or upon notification by the Contractor. Contractor will have **10 business days** to agree and complete items on this punch list. Any and all items not listed on the final punch list will be deemed accepted.

**4.4 Occupancy**. Occupancy of the Home by the Owner shall be deemed to be unconditional acceptance of the Home by Owner and shall release the Contractor from any further obligations pursuant to this agreement EXCEPT completion of Punch List items which could not be completed within the time allowed.

## ARTICLE V
## MISELLANEOUS PROVISIONS

**5.1 Selections**. Owner agrees to make all necessary selections in a reasonable time. If the Owner does not make selections within a reasonable time, the contractor may hold the job idle until selections are made. Owner agrees if contractor holds job idle, Owner will pay contractor the percentage complete of the current draw and will pay contractor any cost associated with the delay.

**5.2 Permits, Fees, and Tests**. The Contractor shall secure and pay for building permits, licenses and other similar approvals necessary for the proper execution and completion of the work. If necessary, the Owner agrees to assist the Contractor in obtaining any such permits and licenses by completing all necessary applications and forms. However, if a covenant or an architectural review committee requires the approval of plans and specification, the Owner shall be responsible for obtaining these approvals and paying for any fees connected with them.

**5.3 Insurance**. The Contractor shall keep in effect workman's compensation and commercial general liability coverage. The required builders risk policy will be carried by the Contractor.

**5.4 Concealed Conditions**. The Contractor is not responsible for subsurface or latent physical conditions at the site or in an existing structure that differ from those (a) indicated or referred to in the contract documents or (b) ordinarily encountered and generally recognized as inherent in the work of the character provided for in this contract.

After receiving notice of the conditions, the Owner shall investigate the condition within <u>five (5)</u> working days. If the parties agree that the condition will increase (a) the Contractor's cost of performance of any part of the work under this contract or (b) the time required for that work, the parties may sign a change order agreement incorporating the necessary revisions, or the Owner may terminate the contract.

If the Owner terminates the contract, the Contractor will be entitled to recover from the Owner payment for all work performed, including normal overhead, and a reasonable profit.

**5.5 Governing Law and Assignment**. This Agreement will be construed, interpreted, and applied according to the law of the State of Arkansas.

**5.6 Effective Date and Signature**. This Agreement shall become effective on the day it is signed by both parties.

**5.7 Ambiguous**. Any ambiguous terms or contents of this agreement shall not be construed against the Contractor.

**5.8 Attorney's fees**. If either party to this contract defaults, the defaulting or non-prevailing party shall be liable to the other party for all cost, including reasonable attorney's fees, incurred in enforcing or defending any rights or obligations created by this agreement.

**5.9 Heirs, Assigns and Successors**. All agreements and stipulations herein contended, and all obligations herein assumed, shall inure to the benefit of and be binding upon the Heirs, Assigns and Successors of the respective parties hereto.

We the undersigned, have read, understand, and agree to each of the provisions of this Agreement and hereby acknowledge receipt of a copy of this contract.

**Drew Hester Construction, Inc.**
**3250 Southern Oaks Road**
**Conway, AR 72032**
**501.499.4415**
**drewhesterconstruction@gmail.com**

By: _____     Date: _____
    President, Jeremy Drew Hester

By: _____     Date: _____
    Vice-president, Amber M. Hester

**William K. and Linda A. Huston**
**340 Kingsbury LN**
**Prosper, TX 75078**
**bhuston757@yahoo.com**
**lindahustonemail@yahoo.com**

By: _____     Date: _____
    Owner: William K. Huston

By: _____     Date: _____
    Owner: Linda A. Huston



## Drew Hester Construction, Inc.
drewhesterconstruction@gmail.com • 501.499.4415

### AGREEMENT TO HOLD LOT

This agreement (the "Agreement") is made effective as of **January 7, 2022**, by and between Drew Hester Construction, Inc. (the "Seller"), of 3250 Southern Oaks Road, Conway, Arkansas 72032, and **Bill & Linda Huston** (collectively, the "Purchaser").

This Agreement is in place to hold Lot # **95**, in **Winterbrook Sub PH III**, County of **Faulkner**, City of **Conway**, State of **Arkansas** (the "Property"), with an address of **1730 Winterbrook Drive, Conway, AR 72034**. Whereas the Purchaser agrees to put up a non-refundable deposit of **$5,000.00** (the "Deposit") to hold the Property until a Contract to Build on the Property is in place between the Seller, to become the Contractor, and the Purchaser. Whereas, in consideration for the Deposit from Purchaser, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller agrees to hold the Property for Purchaser, and not market or sell it to any other person or entity during the holding period of the Property, as set forth herein.  Upon execution of this Agreement, the Deposit shall be paid, upon agreeance by Seller and Purchaser to a building plan draft and cost estimate, to Seller in full no later than **February 1, 2022**.

The Purchaser will also be responsible for monthly interest payments on the Property in the amount of **$350.00**, due to the Seller on the **1st** business day of each month during the holding period of the Property. Interest payments shall begin on **February 1, 2022**. These monthly payments are non-refundable payments to cover the monthly interest charges on the Seller's loan and real estate taxes for the lot. The payments will cease after one of the following occurs: 1) the purchase of the Property by the Purchaser from the Seller at the beginning of construction, OR 2) the removal of the lot hold, see below for reasons for removal. Payments from Purchaser to Seller toward the Deposit or the monthly interest payments shall be effective upon delivery to Seller personally, or to Seller's mailing address, as provided above.  Payments may be made by cash, check, wire transfer, or any other method acceptable to Seller.

This Agreement expires, and the holding period of the Property ends, on **June 30, 2022**. The time of expiration, and consequently the holding period of the Property, may be extended by mutual agreement by both parties. Agreement to extend shall not be unreasonably withheld by Seller. In the event that the expiration date, or any extended expiration date (if applicable), is reached and a Contract to Build is not in place, the Purchaser forfeits the

**PLAINTIFF'S EXHIBIT C**

Page 1 of 2

Deposit and the hold will be removed. Provided, however, if the reason that a Contract to Build is not in place is due to Seller's repudiation, or other similar circumstances outside of Purchaser's control, Seller shall refund the Deposit to Purchaser. If a Contract to Build is in place before the expiration date of this Agreement, or any extended expiration date (if applicable), the Deposit shall be applied towards the cost of the Property and the home to be constructed thereon. Seller and Purchaser mutually agree that the purchase price of the unimproved Property shall be **$73,000.00**.

**Purchaser:**

_____

Bill Huston

_____

Linda Huston

**Seller:**

_____

Jeremy Drew Hester, President - Drew Hester Construction, Inc.

# You paid Green Van Lines $3,000.00

From: Venmo (venmo@venmo.com)
To: bhuston757@yahoo.com
Date: Thursday, May 5, 2022 at 01:47 PM CDT



You paid Green Van Lines

Moving W282891
Transfer Date and Amount:
May 05, 2022 PDT    - $3,000.00

Completed via a bank transfer from your CAPITAL ONE N.A. account ending in 5121.

Payment ID: 3531674806927638500

For any issues, including the recipient not receiving funds, please contact Venmo, a PayPal, Inc. service, at support@venmo.com or call 1-855-812-4430. After first contacting Venmo, if you still have an unresolved complaint regarding the company's money transmission or currency exchange activity, please direct your complaint to: Texas Department of Banking, 2601 North Lamar Boulevard, Austin, Texas 78705, 1-877-276-5554 (toll free), www.dob.texas.gov

As an obligor of this payment, PayPal, Inc. (855-812-4430) is liable for non-delivery or delayed delivery of your funds.

See our disclosures for more information.

Please do not reply directly to this email. For more assistance, visit our Help Center at help.venmo.com.

This payment will be reviewed for compliance with our User Agreement and if we determine that there is a violation by either party, it may be reversed or your ability to transfer to your bank account may be restricted.

Venmo is a service of PayPal, Inc., a licensed provider of money transfer services. All money transmission is provided by PayPal, Inc. pursuant to PayPal, Inc.'s licenses.

PayPal is located at

2211 North First Street, San Jose, CA 95131



For security reasons, you cannot unsubscribe from payment emails.